# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TAMIKA COLBERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. CIV-08-1216-HE |
| | ) | |
| THE BOARD OF COUNTY COMMISSIONERS FOR OKLAHOMA COUNTY, *et al.*, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

In this case, plaintiff Tamika Colbert asserts claims on behalf of her son, T.D.S., arising out of injuries to her son during his detention at the Oklahoma County Juvenile Detention Center.[1] She asserts claims pursuant to 42 U.S.C. § 1983, alleging her son's constitutional rights were violated due to defendant's failure to protect him and failure to provide appropriate medical care. She also asserts a state law claim for negligence. Although various persons were originally sued in addition to Oklahoma County, the parties stipulated to the dismissal of all the individual defendants, leaving only Oklahoma County as a defendant.[2]

---

[1]*The caption of the case suggests plaintiff is also asserting claims on her own, personal behalf, but neither the substance of the complaint nor the summary judgment briefing gives any such indication. The court has proceeded on the assumption that the only claims involved are those of T.D.S.*

[2]*Defendant suggests some question as to whether the stipulation [Doc. # 46] was designed to dismiss all claims against the individual defendants (which appears to be what the stipulation literally says) or whether it was intended to dismiss only the individual capacity claims against those defendants. As an official capacity claim is a claim against the county in any event, the distinction doesn't matter; plaintiff does not dispute that she is pursuing claims only against the county.*

Defendant Oklahoma County has moved for summary judgment, arguing there is no evidentiary basis for finding a constitutional violation by it under either a failure-to-protect theory or a failure-to-provide-medical-care theory. It also asserts plaintiff's negligence claim under state law is barred by sovereign immunity and the terms of the Oklahoma Governmental Tort Claims Act. Plaintiff has responded to the motion. However, plaintiff's response does not address defendant's arguments as to the state law negligence claim and therefore concedes defendant's motion in that regard.[3]

The standards applicable to defendant's motion are familiar. Summary judgment should be granted where — in light of the pleadings, discovery materials, and any affidavits — there is no "genuine issue" as to any "material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c)(2). The court must review the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party. In re Wal-Mart Stores, Inc., 395 F.3d 1177, 1189 (10th Cir. 2005). The court may not make determinations of credibility nor weigh evidence, and must disregard all evidence favorable to the movant that the trier of fact would not be required to believe. Gossett v. Oklahoma, 245 F.3d 1172, 1175 (10th Cir. 2001). Mere conclusory allegations, without evidentiary support, do not create a genuine issue of fact. L&M Enters., Inc. v. BEI Sensors & Sys. Co., 231 F.3d 1284, 1287 (10th Cir. 2000).

---

[3]*Defendant argues that the State's waiver of sovereign immunity does not extend to the situation existing here, relying on the waiver exception for claims arising from the operation and maintenance of juvenile facilities, 51 Okla. Stat. § 155(25), and other provisions. Section 155(25) appears applicable to the present circumstances; others may be as well.*

Summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Where the nonmoving party bears the burden of proof at trial, that party cannot rely on its pleadings to defeat summary judgment; it must, instead, put forth evidence sufficient to create a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Nevertheless, the moving party must demonstrate its entitlement to judgment as a matter of law.

Background

There is little, if any, dispute as to the known facts relating to the injuries to plaintiff's son, T.D.S.[4] T.D.S. was arrested April 7, 2008, by the Oklahoma City police and detained at the Oklahoma County Juvenile Bureau. At the time of his detention, he was examined by an LPN and was in good health and acting normally. He was housed by himself in a cell in Dayroom B. During the evening of April 10, T.D.S. complained twice of a headache and dizziness and asked for Tylenol. Detention personnel responded that, as it was after hours, only a supervisor could authorize entry into his room and suggested T.D.S. just try to sleep, which he apparently did. The next morning, on April 11, T.D.S. again complained of a headache and Tylenol was provided to him. During the day, he participated in normal activities of the center, but did ask for additional pain medication two or three hours after receiving the Tylenol. He was told he could have it only every four hours. He ate only a

_____

[4]*To the extent any dispute exists, the court has viewed the evidence in the light most favorable to plaintiff.*

3

portion of his lunch, indicating he was feeling nauseous, and "spit up" once during the day.

By the next day, April 12, T.D.S. continued to complain of not feeling well and he looked sick to some of the detention personnel. His mother, plaintiff, visited him that morning, noticing he had a bump on his head, felt unusually warm, and had a runny nose.[5] She asked T.D.S. how he got the bump on his head and he replied that he had fallen off his bunk. He repeated that explanation several times, though plaintiff indicates he did so in a way that left her skeptical as to whether that was an accurate description of what happened.[6] During that conversation, T.D.S. asked his mother if Q.B., another juvenile being detained and who plaintiff and T.D.S. knew,[7] could live with them upon Q.B.'s release, but plaintiff refused. Plaintiff reported her concerns with her son's condition to Detention Staff Supervisor Desmuke who, according to plaintiff, told her she would have T.D.S. see the nurse. The evidence indicates plaintiff continued to participate in normal activities during the afternoon, but staff noticed T.D.S. "squinting" or having problems with his eyes as well as other indications of illness. By evening, T.D.S. was still complaining of a headache and feeling nauseous, but declined a suggestion that he fill out a request for medical assistance. Two or three hours later, T.D.S. was still nauseous and dizzy and agreed when detention officer Carter indicated she would fill out a medical assistance request for him. However,

---

[5]*There is evidence plaintiff noticed redness in one of T.D.S.'s eyes. Detention staff described his eye as "pinkish" or like pinkeye.*

[6]*Plaintiff indicates that a detention officer was present during her visits and speculates that T.D.S. may have wanted to avoid stating, in the officer's presence, what really happened.*

[7]*There is evidence that T.D.S. and Q.B. were both members of the same gang.*

Carter forgot to turn in the request by the end of her shift and did not do so. There is evidence that Carter and others did not record or report their concerns so that detention personnel on subsequent shifts would be aware of T.D.S.'s condition and history.

The morning of April 13, a Sunday, detention staff discovered T.D.S. in his cell, noticing a foul smell coming from it. T.D.S. had what appeared to be vomit and feces on his clothes, exhibited swelling on the side of his head, and one side of his face appeared to sag as though by a stroke. He had difficulty speaking in response to staff's inquiries. The staff members who discovered T.D.S. at this point then notified supervisor Desmuke, who came to the cell in the next few minutes, observed the condition of T.D.S. and the cell, and observed T.D.S.'s difficulty in speaking. There is some dispute whether Desmuke directed T.D.S. to be cleaned up before or after breakfast, but he was allowed to shower. A tray of food, which he did not eat, was brought to him. Desmuke contacted the facility nurse by phone at approximately 9:00 a.m. The nurse was not on site. It is not clear what information Desmuke relayed to the nurse about T.D.S.'s condition,[8] but it is undisputed that the nurse advised that plaintiff be given ibuprofen and an ice pack for his face.

Desmuke and other staff members thereafter checked on T.D.S., by observing him through the window to his cell, several times during the morning. By approximately 11:30 a.m., staff noticed a worsening of T.D.S.'s condition, who was unconscious, had vomited, and was non-responsive. Desmuke was contacted again, who again contacted the nurse.

_____

[8]*Desmuke and the nurse's accounts differ as to what information Desmuke relayed and how serious she described T.D.S.'s condition to be.*

This time, the nurse indicated an ambulance should be called.  Desmuke reported this development to her supervisor and then called for the ambulance.

T.D.S. was able to walk to the gurney for the ambulance and, after treatment by EMT personnel, was transported to Deaconess Hospital at approximately 1:30 p.m.  Due to the need for particular medical personnel, T.D.S. was then transferred to the O.U. Medical Center, where he remained for approximately four months.  He was ultimately diagnosed as suffering from a traumatic brain injury.  He presently remains non-verbal and non-ambulatory and is not expected to significantly improve.

The specific cause of T.D.S.'s injury — which is central to the disposition of at least some aspects of this motion — is essentially unknown.  Plaintiff initially alleged that T.D.S. was beaten by another inmate or a detention officer (Compl. ¶ 12), but concedes there is no evidence of a beating by a detention officer and that plaintiff herself does not believe that. T.D.S.'s own explanation to plaintiff, though she disbelieves it, was that he fell off his bunk. Plaintiff argues that the likely cause was a beating by Q.B., alluding to Q.B.'s presence in the detention center, T.D.S.'s references to Q.B. during their conversations, Q.B.'s gang ties, history of violence, and Q.B.'s later expression to plaintiff that he had nothing to do with T.D.S.'s injury.   The intake records at Deaconess indicate T.D.S. stated he was "hit in the head," though they also indicate he was unable to answer questions other than with a yes or no answer.[9]  Even viewing the evidence in the light most favorable to plaintiff, it does not

[9]*There is also evidence that plaintiff asked T.D.S. at Deaconess "who did this to you?," but received non-responsive answers — answers of "uh-huh" to that and to the question of whether*

suggest a non-speculative basis for determining what happened to T.D.S.

In addition to these facts, plaintiff has presented evidence of insufficient staffing at the detention facility, inadequate procedures, and the like.

<u>Discussion</u>

As noted above, plaintiff's civil rights claims are brought pursuant to 42 U.S.C. § 1983, which provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

Section 1983 does not create substantive rights, but merely provides a remedy for deprivations of rights that are established elsewhere. <u>Albright v. Oliver</u>, 510 U.S. 266, 271 (1994).

Plaintiff asserts claims based on the Due Process Clause of the Fourteenth Amendment, which affords pretrial detainees like T.D.S. the same protections as are afforded convicted prisoners by the Eighth Amendment. <u>Hocker v. Walsh</u>, 22 F.3d 995, 998 (10th Cir. 1994). Under this standard, detention officials have a duty to take reasonable steps to protect detainees from violence at the hands of other prisoners. A constitutional violation in this context is established where the plaintiff shows that conditions of confinement are

---

*"one, two, three, four, five" did this to you. Colbert Depo. 102:23–103:9, Pl.'s Br. Ex. 1 [Doc. # 70].*

such as create a "substantial risk of serious harm" and that the official alleged to have violated plaintiff's rights was not only "aware of the facts from which the inference could be drawn that a substantial risk of harm exists," but "also dr[ew] the inference." Howard v. Waide, 534 F.3d 1227, 1236 (10th Cir. 2008) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Where, as here, a plaintiff seeks to impose liability on a county or similar political subdivision, he or she must show the county was the "person" who caused plaintiff to be subjected to the constitutional deprivation. This requires plaintiff to establish (1) that a county employee or other agent committed a constitutional violation, and (2) that a county policy or custom was the moving force behind the constitutional violation. Myers v. Oklahoma County Bd. of County Commr's, 151 F.3d 1313, 1318 (10th Cir. 1998) (citing Monell v. Dept. of Soc. Servs., 436 U.S. 658, 694 (1978)). Per Monell, liability is not based on the theory of *respondeat superior* but on proof that the county's policy or custom was the "moving force of the constitutional violation." Polk County v. Dodson, 454 U.S. 312, 326 (1981) (internal citation and quotation marks omitted). Similarly, county liability under § 1983 cannot be established via the doctrine of *res ipsa loquitur*, a rule which permits an inference of negligence in certain circumstances. Estate of Olivas v. Denver, 929 F.Supp. 1329 (D.Colo. 1996).[10]

---

[10]*No party has suggested the application of res ipsa loquitur here, but the court notes its non-applicability to a § 1983 claim because the state of plaintiff's proof approximates circumstances in which it might otherwise apply.*

Here, the court's analysis of plaintiff's failure-to-protect claim has been complicated by the fact that plaintiff has not identified <u>any</u> county employee who allegedly committed a constitutional violation and for whose conduct she seeks to hold the county liable. While such an individual's presence as a party is not essential, it is at least important to identify the individual whose conduct is alleged to have constituted the violation.[11] Who is the person as to whom the evidence of subjective knowledge of risk to the plaintiff must be evaluated? That plaintiff has not done so here is understandable, however, given the bigger problem she faces in this case — one of establishing the causation necessary to any § 1983 claim.[12] Defendant argues — and the court agrees — that the evidence here is insufficient to establish any basis for a failure-to-protect claim in plaintiff's favor. Stated otherwise, the undisputed facts show the absence of any basis upon which a jury might conclude, beyond mere speculation, that a particular constitutional violation either occurred or, if it did, caused plaintiff's injuries.

It is undisputed that T.D.S. suffered a substantial injury while in the detention center, but it is equally clear that we do not know how he suffered it. Plaintiff concedes there is no evidence of any beating or similar conduct by an officer of the facility. Plaintiff's surmise that T.D.S. was beaten by Q.B. or some other inmate is simply speculation. There were no

---

[11]*See* <u>Lopez v. LeMaster</u>, *172 F.3d 756, 760 (10th Cir. 1999) ("Appellant not only did not name his jailer as a defendant in this suit, he failed to identify him at all. That omission seriously undermines his attempt to hold the county liable for any actions deliberately taken by the jailer.").*

[12]*See* <u>Lippoldt v. Cole</u>, *468 F.3d 1204, 1219 (10th Cir. 2006) (quoting* <u>Scott v. Hern</u>, *216 F.3d 897, 911 (10th Cir. 2000) ("A plaintiff must allege factual causation — i.e. 'but for' causation — in order to state a claim under § 1983.")).*

witnesses.  There is nothing about T.D.S.'s injuries which suggests a beating as opposed to other explanations.  While there may be reason to question T.D.S.'s explanation to his mother — that he fell from his bunk — that does not translate into a basis for an affirmative conclusion that Q.B. or someone else beat him.  The statements attributed to T.D.S. by the medical intake personnel (that he "was hit in the head") might mean someone hit him in the head but it might also mean he was hit in the head by falling off his bunk.  Particularly in light of the undisputed evidence of his substantial non-responsiveness at that time, this evidence does not constitute a non-speculative basis for concluding he was beaten or for choosing among the multiple potential explanations of his injury.[13]

Absent evidence sufficient to create a justiciable question as to how T.D.S. was injured, there is no basis upon which a jury might conclude a constitutional violation occurred for which defendant should be liable or that any such violation caused his injuries.  Plaintiff's evidence can best be characterized as showing "he was healthy when he entered the facility and hurt when he left."  However, such a showing, even though clearly indicated by the parties' submissions, is not sufficient to make out an actionable constitutional violation.  Defendant's motion must therefore be granted insofar as it addresses plaintiff's failure-to-protect claim.

The focus of the analysis as to plaintiff's claim based on the provision of medical care

---

[13]*The parties' submissions suggest, for example, that plaintiff may have been beaten by Q.B. or someone, that he may have gotten dizzy due to the heat (or some other condition) while standing on his bunk to talk to others in adjacent cells and then fell, that he may have simply fallen off the bunk in the morning, or that he may have taken medications of some other detainee.*

is somewhat different.  Unlike plaintiff's failure-to-protect claim, there is arguably evidence here from which a jury might conclude deficiencies in T.D.S.'s medical care contributed to his injuries, sufficient to meet the causation requirement of § 1983.[14]  The critical question here is whether there is evidence from which a jury might find a substantive constitutional violation to have occurred.  And as with the failure-to-protect claim, in order for plaintiff to establish the county's liability for any violation established, she must show that a county employee or agent committed the constitutional violation and that some county policy or custom was the moving force behind it.  Myers, 151 F.3d at 1318.

As noted above, a prison official's "deliberate indifference" to a substantial risk of harm to a detainee violates his Due Process rights.  See Farmer v. Brennan, 511 U.S. at 828 (Eighth Amendment standard applicable to prisoners).  "A claim for inadequate medical attention will be successful if the plaintiff shows 'deliberate indifference to serious medical needs.'"  Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting Hocker, 22 F.3d at 998).  An inadvertent failure to provide adequate medical care, or mere negligence in diagnosis or treatment, does not constitute a constitutional violation.  Estelle v. Gamble, 429 U.S. 97, 105–06 (1976).

A constitutional violation in this context has both an objective and subjective component.  The objective element of the test is met if the "harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause" of

_____

[14]*At any rate, defendant's motion has not raised any issue as to causation insofar as the medical care claim is concerned.*

the Eighth Amendment.  Martinez v. Beggs, 563 F.3d at 1088 (quoting Mata v. Saiz, 427 F.3d 745, 752–53 (10th Cir. 2005) and Farmer, 511 U.S. at 834) (internal citation and quotation marks omitted).  Here, there is obviously evidence from which a jury might conclude T.D.S. suffered "sufficiently serious" harm.

To meet the subjective element of the analysis, plaintiff must demonstrate that defendant acted with "deliberate indifference" to T.D.S's medical needs.  Mata, 427 F.3d at 755.  This requires proof that the particular defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm."  Farmer, 511 U.S. at 842.  Plaintiff must prove that the particular defendant had actual knowledge of a substantial risk of harm to the prisoner, not merely that he or she should have known of the risk.  The subjective deliberate indifference element of the test "serves . . . to ensure that only inflictions of *punishment* carry liability" under the Eighth Amendment.  *Id.* (emphasis added).  A prison/detention official whose actions are merely negligent does not inflict punishment and so cannot violate the Eighth Amendment.[15]

As with the failure-to-protect claim, plaintiff does not formally assert claims against any particular individual alleged to have violated T.D.S.'s rights.  And apart from fleeting references to "guards" or others,[16] plaintiff's briefing alludes only to Detention Staff

---

[15]*As noted above, plaintiff's claims here are based on T.D.S.'s status as a pretrial detainee and are hence evaluated under the Due Process Clause.  However, in these circumstances, the Due Process standards are the same as those of the Eighth Amendment.*

[16]*For example, plaintiff notes that officer Carter offered to submit a medical request form for T.D.S., but forgot to do so.  As discussed below, this circumstance is evidence of negligence, but does not support a conclusion of deliberate indifference.*

Supervisor Desmuke as someone whose actions or inactions are a basis for claim. The question thus becomes whether there are facts from which a jury might reasonably conclude that Desmuke knew of a substantial risk of harm to T.D.S. and acted or failed to act despite that knowledge.

There is evidence from which the jury could conclude that Desmuke and others knew of a substantial risk of harm to T.D.S. The evidence as to his symptoms by the morning of April 13 supports an inference that Desmuke and others knew of his serious medical condition. However, the undisputed facts make it clear that Desmuke did not ignore T.D.S.'s condition, but rather reacted to it by contacting the facility nurse and then implementing the course of treatment indicated by the nurse. Desmuke and other staff monitored T.D.S. during the morning of the 13th. She contacted the nurse again when his condition worsened.[17] She then followed the nurse's instruction to summon an ambulance. Plaintiff argues that Desmuke should have sought an ambulance earlier, when she first saw T.D.S.'s condition in the morning, or that she should have initially given the nurse more or better information about his condition. Plaintiff also argues that Desmuke, upon being told later by the nurse to summon an ambulance, should have done so immediately without first reporting in to her supervisor. If the question was whether Desmuke responded in less than ideal fashion or was somehow negligent in responding to T.D.S.'s situation, those arguments would have some force. But negligence is not the question for present purposes — the question is whether

---

[17]*Defendant's listing of undisputed facts does not explicitly refer to monitoring during the morning, but the various attachments to plaintiff's and defendant's motions so indicate.*

Desmuke was "deliberately indifferent." The undisputed facts are that she did act in response to plaintiff's condition. Desmuke, who was not a medical professional, may not have taken the ideal steps in response to the situation she encountered, but the proffered evidence does not suggest a basis for a finding that she acted, or failed to act, with deliberate disregard of T.D.S.'s circumstances.[18] The court concludes the proffered evidence does not create a justiciable issue in this regard and that summary judgment is therefore appropriate as to plaintiff's claim for deliberate indifference to medical needs.[19]

Accordingly, defendant's motion for summary judgment [Doc. # 64] is **GRANTED**.

---

[18]*Desmuke's circumstances are somewhat akin to those of nurse Havens in Sealock v. Colorado, 218 F.3d 1205 (10th Cir. 2000), as to whom summary judgment was sustained on the basis that she at worst misdiagnosed appellant and failed to pass on information to a physician's assistant. The court concluded such a showing was insufficient to establish deliberate indifference.*

[19]*In the absence of a constitutional violation by an employee, it is unnecessary to analyze whether some county policy or custom could be said to have been the moving force behind the violation.*

**IT IS SO ORDERED**.

Dated this 2nd day of June, 2010.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE